IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 10, 2017 Session

## STATE OF TENNESSEE v. CALVIN LYNDELL DIBRELL

**Appeal from the Criminal Court for Knox County**
**No. 105374      Steven W. Sword, Judge**

_____

#### No. E2016-02279-CCA-R3-CD
_____

The defendant, Calvin Lyndell Dibrell, appeals his Knox County Criminal Court jury convictions of possession of a controlled substance with intent to sell or deliver within a prohibited zone, claiming that the trial court erred by denying his motion to suppress evidence obtained from the search of his vehicle and that the trial court improperly admitted evidence of the defendant's prior convictions. Because the evidence obtained from the defendant's vehicle was the result of an illegal search and seizure, the judgments of the trial court are vacated, and the case is dismissed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Vacated; Case Dismissed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., and ROBERT L. HOLLOWAY, JR., J., filed a separate concurring opinion.

Jonathan Harwell, Assitant District Public Defender (at sentencing and on appeal), and Paul J. Springer, Memphis, Tennessee (at trial), for the appellant, Calvin Lyndell Dibrell.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Charme P. Allen, District Attorney General; Hector Sanchez and Jason Hunnicutt, Assistant District Attorneys General, for the appellee, State of Tennessee.

#### OPINION

In April 2015, the Knox County Grand Jury charged the defendant, in a 12-count indictment, with two alternative counts of possession with intent to sell or deliver less than 200 grams of oxycodone within 1,000 feet of an elementary school; two alternative counts of possession with intent to sell or deliver dihydrocodeinone within 1,000 feet of an elementary school; two alternative counts of posession with intent to sell or deliver alprazolam within 1,000 feet of an elementary school; two alternative counts of possession with intent to sell or deliver less than 200 grams of oxycodone within 1,000

feet of a child care agency; two alternative counts of possession with intent to sell or deliver dihydrocodeinone within 1,000 feet of a child care agency; and two alternative counts of possession with intent to sell or deliver alprazolam within 1,000 feet of a child care agency. Prior to trial, the defendant sought suppression of the evidence obtained as a result of a warrantless search. Following a hearing, the trial court[1] denied the motion to suppress, and the court conducted a jury trial in June 2016.

The State's proof at trial showed that, on February 17, 2014, Knoxville Police Department ("KPD") K-9 Officer Joey Whitehead was approached at a car wash by a black male driving a green Mitsubishi sedan. Officer Whitehead did not know the man, never asked for his name, and did not record his license plate number. The man informed Officer Whitehead that a man by the name of Calvin Dibrell was selling drugs outside the Walgreens at 2514 East Magnolia. Because Officer Whitehead's patrol car was still in the process of being washed, he contacted other officers to proceed to the scene.

KPD Officer Thomas Turner received Officer Whitehead's call about "an individual possibly selling narcotics" who was driving "a black Chrysler 300 on rims" which was "backed in by the Redbox" at the Magnolia Walgreens. Officer Turner and his two beat partners, KPD Officers White and Pickens, met a short distance from the Walgreen's in their respective patrol cars and discussed how they would approach the man in the Chrsyler. According to Officer Turner, the three officers "decided that we were all going to come in from each [of the three] entrance[s] so that we could have all areas of the parking lot covered and see if we could find him and just conduct a consensual encounter, talk to him." Officer Turner and fellow KPD Officer White arrived simultaneously at the Walgreens and parked their patrol cars nose-to-nose perpendicularly to the black Chrysler described by Officer Whitehead; the Chrysler was backed into a parking space and facing the patrol cars. The defendant was seated in the driver's seat of the vehicle, and Officer Turner approached and began speaking with the defendant. Officer Turner testified that the defendant was free to leave at that time. Upon Officer Turner's request, the defendant stepped out of his vehicle and submitted to a weapons pat-down. Officer Turner confirmed that the Magnolia Avenue area was a "high drug/high crime area" where he had been involved with "dozens of felony drug cases."

When Officer Whitehead arrived at the scene, the defendant was standing by a Redbox video rental machine talking to other police officers. Officer Whitehead used his police dog to conduct a "free-air sniff" of the defendant's vehicle. According to

---

[1] Judge Bob R. McGee was originally assigned the defendant's case and presided over the hearing on the motion to suppress. Shortly thereafter, the case was transferred to Judge Sword's court.

Officer Whitehead, after walking the dog around the defendant's vehicle "at least twice," the dog "showed a noticeable change of behavior at the rear back passenger door." Officer Whitehead conceded that, because of where the police cruisers were parked in relation to the defendant's vehicle, no cruiser video footage showed the dog's reaction to the rear passenger door. Video footage obtained from the cruisers of both Officer Whitehead and Officer Turner was admitted into evidence and played for the jury.

On cross-examination, Officer Whitehead confirmed that his dog was trained to react to the smell of marijuana, cocaine, methamphetamine, ecstasy, and heroin. Officer Whitehead explained that the dog reacted to a "residual" or "lingering" odor in the vehicle, but he acknowledged that the dog could "have just been wrong." Officer Whitehead conceded that the defendant, at one point, stated to officers that he wished he "had all the cocaine that everybody think[s]" he had. Officer Whitehead agreed that two police cruisers were parked in a perpendicular position to the defendant's vehicle but denied that the defendant's vehicle was blocked in.

After Officer Whitehead indicated to Officer Turner that the dog had "positively" reacted to the presence of narcotics, Officer Turner searched the defendant's vehicle. Officer Turner located a "zippered pouch" in the vehicle's backseat which contained three pill bottles each containing a different narcotic. The label on the first bottle indicated it contained medication prescribed to the defendant in Mountain Home, Tennessee, in January 2013; the bottle contained 9 hydrocodone pills. The second bottle contained 40 30-milligram oxycodone pills, and the label indicated that it contained medication prescribed in Knoxville to Paul Johnson on January 6, 2014. The label on the third bottle indicated it contained medication prescribed to the defendant in Daytona Beach, Florida, in 2010; the bottle contained 42 one-milligram alprazolam pills. Officer Turner testified that none of the pills contained in the three pill bottles matched the descriptions on the pharmacy-created bottle labels. When the defendant was searched, officers found in his pockets $800 in cash and a plastic bag containing 30 additional 30-milligram oxycodone tablets, which tablets did not match those contained in the second pill bottle.

On cross-examination, Officer Turner conceded that Mr. Johnson "arrived on the scene" of the defendant's arrest and told Officer Turner that the oxycodone pills were his and that they were in the vehicle because he had possession of the defendant's vehicle earlier in the week. When asked why he had parked in front of the defendant's vehicle rather than pull into an available parking space, Officer Turner stated that it was "an officer safety issue."

KPD Investigator Chris Jones testified as an expert in the field of drug investigations. Investigator Jones testified that prescription pill dealers typically have greater quantities of pills than pill addicts because the addicts "run[] through their source themselves" and that dealers often carry large quantities of cash and a variety of narcotics. Investigator Jones also stated that pill dealers often carry narcotics in plastic bags to keep the pills "within close proximity of their person." Based on his training and experience, Investigator Jones opined that the defendant's possession of the drugs in question, along with the large amount of cash, the different pill bottles, the plastic bag, and the area of town, indicated an intent to sell the narcotics.

The parties stipulated to the accuracy of a Tennessee Bureau of Investigation laboratory report regarding an analysis of the pills found in the defendant's possession. The report, which was entered into evidence, indicated that a confirmatory analysis was performed on one tablet from each of the four sets of pills and that the defendant was found with the following: 30 oxycodone tablets; 40 oxycodone tablets; 9 dihydrocodeinone tablets; and 42 alprazolam tablets. The parties also stipulated that the Walgreens at issue was within 1,000 feet of both an elementary school and a childcare agency.

With this evidence, the State rested. Following a *Momon* colloquy and the trial court's denial of the defendant's motion for judgment of acquittal, the defendant elected to testify and to present proof.

Paul J. Johnson, Sr., testified that he had been a friend of the defendant's for nearly 30 years. In mid-February 2014, Mr. Johnson had borrowed the defendant's vehicle for a few days, and he returned the car to the defendant on February 17. Approximately one hour later, Mr. Johnson received a telephone call informing him that the defendant had been placed under arrest at the Walgreens on Magnolia. Mr. Johnson proceeded directly to the Walgreens, where he discovered the defendant seated in the back of a patrol car. Mr. Johnson informed one of the police officers that he had "some personal things" in the defendant's car, but the officers would not allow him to retrieve his belongings. Mr. Johnson testified that he had left a "bottle of Opanas and a bottle of" oxycodone in the vehicle, explaining that he had "two artificial knees" and a "slew of health problems" that resulted in his need for those legally-prescribed pain medications.

The 52-year-old defendant testified that he was sitting in his car in the Walgreens parking lot on February 17 talking on his cellular telephone and waiting for a woman and her child to walk away from the Redbox so that he could rent a movie. He also confirmed that a young lady he "was acquainted with" had gone into the store and that he had intended to give her a ride home. While he was waiting, he was approached

by several KPD officers, including Officer Turner, who questioned him about selling cocaine in the parking lot. The defendant denied selling any drugs and refused to permit the officers to search his vehicle. The officers then informed the defendant that a police dog was going to walk around his vehicle. According to the defendant, the dog circled his car twice but paid no attention to it and "never even looked at" his car.

When the officers informed the defendant that the dog had "alerted" to his vehicle, they placed the defendant under arrest "for having [his] medication." The defendant stated that he recognized KPD Officer Baldwin at the scene because the officer had arrested the defendant "a couple of months earlier for pretty much the same thing, going about [his] business, doing nothing, and all [of a] sudden [he's] getting searched and thrown in jail." With respect to the $786 in cash found by the officers, the defendant stated that he thought the money might have been inside his briefcase or generally in the car because he does not "like having stuff in [his] pocket."

The defendant explained the purpose of the narcotics found by the officers as follows:

> I'm a disabled veteran, United States Army field artillery. My job used to be throwing hundred pound artillery shells downrange anywhere from 15 to 20 miles obliterating targets. That's the type of job that takes a toll on guys' bodies. Shoulders, hips, knees, they go out after a period of time.

> . . . .

> What my situation was[,] had a[n] accident. Blew up my knee, and that caused this shoulder to have to be replaced with titanium. I have plates in my jaw, titanium plates. I have to eat something using the food processor. Cannot chew. So in − in dealing with these conditions, which I'll deal with till the day I die, I take prescription medication.

> . . . .

> I've had so many doctors down through the years I can't recall them all. I've been seeing physicians since 2003. Now, here it is 2016.

The defendant denied ever selling any pills. When asked about the discrepancy between the pill bottle labels and their contents, the defendant stated that he

- 5 -

had "no idea what . . . that's all about" and that "everything was in bottles where it was supposed to be."

On cross-examination, the defendant had no explanation for the plastic bag of oxycodone pills, but he denied that officers found it in his pocket. The defendant agreed that the prescription label on the bottle of hydrocodone pills indicated that the pills were imprinted with "M363" but that the pills found inside the bottle were not so imprinted; that the label on Mr. Johnson's bottle of oxycodone pills indicated that those pills were imprinted with a "V" on the front and "4812" on the back but that the included pills did not have those identifiers; and that the label on the bottle of alprazolam pills indicated that the bottle contained 30, tan, two-milligram pills but that the bottle actually contained 42, blue, one-milligram pills. The defendant explained that "[e]verything you have in your hands left my possession" and that "[w]hat it may be after it left my possession . . . I can't help you."

The defendant admitted that, in the past, he had pleaded guilty to aggravated burglary and had been convicted of attempted second degree murder.

On redirect examination, the defendant testified that he had inherited $160,000 in 2013 following the death of his mother.

Based on this evidence, the jury convicted the defendant as charged on all 12 counts. Following a sentencing hearing, the trial court merged the alternative counts and sentenced the defendant, on count one, as a multiple offender to a term of 12 years' incarceration to be served at 100 percent by operation of law. On counts 3, 5, and 7, the trial court sentenced the defendant to a term of six years' incarceration, and on counts 9 and 11, the court imposed four-year sentences, all to be served concurrently with the defendant's sentence in count one for an effective sentence of 12 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant challenges the trial court's ruling denying his motion to suppress and contends that the trial court erred by permitting the State to impeach him with two prior felony convictions. We will address each issue in turn.

*I. Motion to Suppress*

The defendant first contends that the trial court erred by refusing to suppress the evidence obtained from the warrantless search of his vehicle because the

officers did not have reasonable suspicion to support their brief, investigatory stop and the defendant's resulting illegal seizure.

At the hearing on the defendant's motion, Officer Whitehead testified that, while he was having his patrol car washed on February 17, he was "flagged down by an individual in a green Mitsubishi Galant, black male." The man "stated that there was a black Chrysler 300 driven by a black male that was backed in at the Walgreens on Magnolia selling narcotics." The man identified the black male in the Chrysler as Calvin Dibrell. Because Officer Whitehead could not yet retrieve his vehicle from the car wash, he radioed the tip to KPD Officers Turner, White, and Pickens. Officer Whitehead testified that he and his dog arrived at the Walgreens approximately five minutes later and that he "conducted an exterior vehicle sniff" with his dog. Officer Whitehead recalled that the defendant was out of his vehicle at the time he arrived and that he was behaving in a confrontational manner and "did not want to be patted down for weapons or anything like that." Officer Whitehead testified that his dog "alerted on the vehicle" and that he and his fellow officers then conducted a search of the defendant's vehicle.

On cross-examination, Officer Whitehead conceded that he had obtained no personal information from the man who gave him the tip; he had not asked whether the man had purchased any narcotics from the defendant or how he had learned that the defendant was selling drugs; he had never used the man as a prior informant or known him to be someone who had worked with the KPD in the past; and he had no independent basis for determining whether the man was providing him with credible information. Officer Whitehead was "pretty sure" that Officer White and Officer Turner were in the process of conducting a weapons pat-down on the defendant while Officer Whitehead was arriving in the parking lot. Officer Whitehead confirmed that his dog was trained to detect the odors of marijuana, cocaine, methamphetamine, ecstasy, and heroin and that none of those narcotics were located in the defendant's vehicle. Officer Whitehead explained that the dog could have detected a "previous odor" emanating from the vehicle. When asked if the dog could have given a false positive response, Officer Whitehead responded that it was "possible, but there's no way," stating that his dog consistently maintained a proficiency rate of 95 percent or higher.

Officer Turner testified that Officer Whitehead had radioed to him on February 17 "about a possible drug dealing suspect" and had described the suspect as a "black male sitting in a black Chrysler 300, backed into the Walgreens on Magnolia, right next to the Redbox." Officer Turner estimated that he, Officer White, and Officer Pickens arrived at the Walgreens within five to 10 minutes. Immediately upon his arrival, Officer Turner observed the defendant "sitting in a black Chrysler 300, backed in right next to the Redbox in front of Walgreens." Officer Turner "just started a

conversation with him, you know, hey, what's going on? [H]ow you doing? [W]ould you mind stepping out of the car for us, talk to us for just a minute?" Officer Turner stated that the defendant willingly stepped out of his vehicle, and he denied asking the defendant for permission to search his vehicle prior to the arrival of Officer Whitehead. Following the dog's vehicle sniff, Officer Turner searched the defendant's vehicle and recovered contraband in the back seat.

When asked on cross-examination why Officers Turner, White, and Pickens had all arrived at the scene at the same time, Officer Turner responded that there was "[n]o particular reason" and that the three officers "were just all pretty close together and we all just went." According to Officer Turner, the only conversation he had with the defendant prior to asking him to step out of his vehicle was "very basic . . . pleasantries." Officer Turner explained that the defendant was asked to step out of the car for "officer safety": "If we're going to stand there and talk to somebody, we'd rather have them out of the car" because "if there is a weapon in the car, if there is any kind of – anything that could be dangerous to us in the car, we'd rather have them separated from that and out of the car where we can see them more easily."

At the conclusion of the hearing, the original trial judge denied the defendant's motion to suppress and made the following findings:

> In this case, it appears to the [c]ourt that while the officer is having his car washed, someone – this is not a completely anonymous tip. This is a real person coming up to the police officer and telling him that somebody is parked in a black car, it's backed up in a parking spot down at Walgreens and they're selling drugs out of their car. That gave the officers, certainly, enough reasonable suspicion to at least go to the scene and see if it did appear that somebody was backed up in a black car at the Walgreens. And they did so. There's nothing unreasonable about that.
>
> At that point, the officers approached the defendant and started engaging him in coversation. That is not a stop. The defendant was not – these officers didn't stop the defendant. The defendant was parked when they got there. And they didn't seize him at that point. Just going – anybody can go up and just start talking to anybody else. They can turn around and walk off if they want to or they can respond.

- 8 -

Apparently, [the defendant] did respond. They exchanged a few words with each other. And within just a very short period of time – now, their purpose there was to investigate to see if, in fact, it appeared that there was drug dealing going on out of that car at that location.

In just a few moments, the first officer, Officer Whitehead, showed up with his K-9 and conducted a K-9 sniff. That did not violate any right of the defendant – any right of the defendant's privacy. And they got a positive hit. They got an alert or an alarm, whatever they call it, that there was the odor of illegal narcotics emanating from the car or in the car.

That gave the officers more authority to conduct a further search. This is an automobile search, an automobile. The fact that it is an automobile creates an exigency of sorts. And, again, their purpose in this stop, in this interaction with the defendant, was to investigate the illegal sale of drugs. So they did look in the car – the [c]ourt would have to find that that was appropriate, given all the circumstances – and they found a bag and opened the bag and found the pill bottles.

Under the circumstances, there's – it's a concerned citizen's complaint that there is drug dealing going on, there is the positive alert by the dog. So it's not just one thing, it's two things that combine to give them – this [c]ourt would hold, gave them sufficient reasonable suspicion to look in the bag and to look in the pill bottles.

And at that point, they did understand then that the pills in the bottles were not the ones that were supposed to be in there. They were not the ones that were on the – on the prescription. They were not the drugs that were supposed to be in those bottles. And at that point, the [c]ourt would have to find that it was appropriate for them to – under the evidence as it's been presented in this hearing, that's when they put hands on the defendant, that's when they started patting him down.

At that point, the [c]ourt would agree that he is seized. But at that point, the [c]ourt would hold that they had sufficient evidence and sufficient probable cause to seize him at that time and to detain him for futher questioning.

So at this point, the [c]ourt does not find any basis for suppressing the pills, the evidence that the officers uncovered.

Defense counsel then informed the court that he had yet to receive the police cruiser videos and requested to revisit the suppression issue "if the video contradicts what has been testified to." The court agreed to leave the motion open and take it up again before trial. Although defense counsel later announced his intention to file an amended motion to suppress based on the cruiser videos, he did not do so.

When the cruiser videos were introduced into evidence at trial, Officer Turner's cruiser video showed he and Officer White arriving at the Walgreens at 3:37 p.m. Because of the position of Officer Turner's parked cruiser, only the front driver's side headlight and surrounding bumper of the defendant's vehicle is visible in Officer Turner's video, but the officers' conversation with the defendant can be heard through the officers' body microphones. Because none of the speakers are visible on camera, it is difficult to ascertain which officer is speaking to the defendant. Beginning at 15:37:37, the following discussion can be heard between officers and the defendant, whose driver's side window was apparently open:

> Officer:     How you doing today, sir?
>
> Defendant:  Fine, how you doing?
>
> Officer:     Doing good.  You waiting on somebody, or . . .
>
> Defendant:  I'm giving somebody a ride, what's the problem?
>
> Officer:     You're giving somebody a ride, where they at?
>
> Defendant:  They inside the store.
>
> Officer:     They inside?  What are they wearing inside, so I can verify it?

Defendant:    Excuse me?

Officer:    What are they wearing? The people you are giving a ride, what are they wearing?

Defendant:    Young lady's in there, she's waiting on her medicine, I'm giving her a ride. What's the problem?

Officer:    We got a complaint that you may be in this parking lot doing things that aren't exactly legal.

Defendant:    Like what?

Officer:    Selling narcotics?

Defendant:    Yeah, ok.

Officer:    Yeah you are selling narcotics?

Defendant:    Ok, whatever, I don't know what you are talking about there.

Officer:    You don't know what I'm talking about?

Defendant:    Nah.

Officer:    Okay, there's nothing illegal in your car or on your person?

Defendant:    No.

Officer:    Alright. You don't mind stepping out of the car for my partner real quick there. There's nothing illegal . . . .

The preceding conversation took one minute. The defendant then apparently steps out of his vehicle, and at 15:38:47, an officer says to him, "You understand, we get a complaint like this, we gotta take it seriously, make sure. They said black Chrysler on rims, backed

in by the Redbox." According to Officer Turner's testimony, he conducted a weapons pat-down of the defendant at this time. A brief discussion of some damage to the defendant's vehicle can be overheard, with the defendant commenting that the damage had been caused by "an ex-girlfriend's boyfriend." At 15:39:08, an officer tells the defendant, "You're good, if you want to hang tight on the sidewalk there." Over the course of the next minute, the defendant can be overheard giving officers his name and date of birth, and at 15:40:15, an officer again instructs the defendant to "hang tight."

An officer then asks the defendant for the name of the person he was waiting on, and the defendant, after making a dismissive sound, responds, "You said somebody said, they called and said I was doing something. Here I am." An officer then asks if there was anything illegal in the vehicle. The defendant definitively states, "No." At 15:40:35, an officer says that "somebody's given us false information then." The defendant responds, "Well, you know, obviously people do what they do." When an officer asked if the defendant cared if they "looked through" his vehicle, the defendant, at 15:40:51, says, "No, no, no" and "My car's fine, thank you. You don't need to look at it." An officer says, "Ok," and then Officer White states that he intends to move his cruiser into a nearby parking space.

At 15:41:10, the defendant and an officer engage in a congenial conversation about the defendant's car engine. At 15:41:17, Officer Whitehead's cruiser is visible, pulling into the Walgreens parking lot. An officer continues to make smalltalk with the defendant, asking if he has always lived in Knoxville.

At 15:43:27, Officer Whitehead and his dog begin circling the defendant's vehicle, starting near the front driver's side headlight. Ten seconds later, the dog again passes the same headlight, and at 15:43:47, Officer Whitehead is seen walking the dog back to his cruiser. At 15:43:53, the defendant laughingly states, "I wish I had all the cocaine that everybody thought I had. That would be great!" When an officer asks who had mentioned cocaine, the defendant continues to laugh and comments on the five police cruisers that are then present in the parking lot. At 15:44:15, Officer Whitehead can be seen speaking with another officer in the parking lot, away from the defendant's vehicle.

Finally, at 15:45:40, Officer Whitehead begins walking toward the defendant's vehicle, and five seconds later, the defendant says, "Time out. What's this right here?" An officer responds, at 15:45:48, that the dog made a positive reaction and that officers were going to search his vehicle, and the defendant expresses his disbelief.

At the defendant's motion for new trial, defense counsel again raised the issue of suppression, arguing that the cruiser videos provided additional information that

the original trial court was not privy to and that the videos showed the narcotics recovered from the defendant's vehicle were the result of an unlawful search and seizure. The trial court ruled as follows:

> Regarding the motion to suppress, this is a – this is a really – as [defense counsel] said, really kind of a procedurally odd situation that we find ourselves in where the suppression hearing was conducted in front of another judge, and then I heard the trial, and I heard a lot of the proof, but it really wasn't the same stuff. In some ways it was more proof and other ways it was less than what Judge McGee heard, and so it makes it difficult for me to be able to rule on that, because the state did take steps to avoid introducing evidence through Officer Whitehead that they had received this tip from an anonymous informant about [the defendant's] selling drugs there. So they didn't get into that much. The defense actually on cross-examination is the one that brought up this person, started challenging him.

> Had that been brought up during a suppression hearing, I suspect I would have heard a lot more about who that person was, what they were doing, Officer Whitehead didn't write their name down, but I didn't hear anything during the trial, 'cause we were sort of avoiding it about what details were said, and so I'm sort of at a disadvantage of knowing exactly what the officers [were] relying upon when they went over there.

> If I was ruling on when a seizure would occur, based upon what I heard at the trial, which, again, a trial's not really focused on – on the validity of this encounter, and so it's really sort of a difficult issue for this [c]ourt to rule on based upon what I heard in the trial, but I would say based upon what I heard, he was seized when he was asked to step out of the . . . car. And so at that point, I think everything that proceeded from then on until he was arrested was a brief investigatory detention, which would need to be supported by reasonable suspicion. And so what we had is who knows who this person was, if they were a citizen informant, or a

- 13 -

member of the criminal milieu. We really don't know, because that wasn't gotten into in the trial in front of me.

What we do know is that Officer Whitehead arrived a very short time after that, and the dog alerted on the vehicle, and that's – it was after that that they found it, so it's kind of hard for me to piece together exactly what happened here. I'm going to rely on Judge McGee's prior ruling, because I think – I think that I'm bound to that, and I would say that there was nothing that was presented during the trial that would make me say that Judge McGee's ruling was wrong, and so I'm going to find that the officer did have reasonable suspicion at the point that it was a seizure based upon what this citizen said to the officers and what they were observing when they arrived. And so like I said, if I was doing that suppression hearing, I would ask a lot more questions and different questions than that were brought out in front of the trial. So I'm going to find that that's not grounds for a motion for new trial as well.

In this appeal, the defendant asserts that the trial court erred by denying his motion to suppress the evidence seized during the search of his vehicle, claiming that, first and foremost, the uncorroborated tip was not sufficiently reliable so as to justify the investigatory stop of the defendant's vehicle; that the defendant was effectively seized when Officers Turner and White parked perpendicularly in front of the defendant's vehicle because the defendant would not have reasonably believed he was free to leave; that, even if the prior incident did not constitute a seizure, the defendant was seized upon being asked to exit the car and told to wait; and that nothing gleaned from the defendant's seizure rose to the level of reasonable suspicion to justify continuing his detention until such time that the dog allegedly reacted to the presence of narcotics in his vehicle. The State responds that the trial court committed no error because the totality of the circumstances preceding the defendant's arrest, "particularly the detailed informant tip that the police fully confirmed before any detention," sufficiently established reasonable suspicion for them to "briefly detain" the defendant while they developed probable cause for the search.

A trial court's findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting

evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g., State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). Importantly, "appellate courts, when evaluating the correctness of the ruling by the trial court on a motion to suppress, may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012) (citing *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *State v. Chopin*, 372 So.2d 1222; 1223-24 n.2 (La. 1979); *State v. Bruno*, 157 Vt. 6, 595 A.2d 272, 273 (Vt. 1991); Wayne R. LaFave, *Search and Seizure* § 11.7(d) (4th ed. 2004)).

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constituional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). "The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 455 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958), and *McDonald v. United States*, 335 U.S. 451, 456 (1948)). "We are not dealing with formalities. The presence of a search warrant serves a high function." *McDonald*, 335 U.S. at 455. Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *See, e.g., Missouri v. McNeely*, 569 U.S. 141, 148 (2013) ("Our cases have held that a warrantless search of the person is reasonable only if it falls within a recognized exception.").

Police officers are constitutionally permitted to conduct a brief investigatory stop supported by specific and articulable facts leading to reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2002). Whether reasonable suspicion existed in a particular case is a fact-intensive, but objective, analysis. *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). The likelihood of criminal ativity that is required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). A court must consider the totality of the circumstances in evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts. *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). The totality of the circumstances embraces considerations of the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 34 (Tenn. 1993). The objective facts on which an officer relies may include his or her own observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

"Special considerations arise, however, when the State seeks to justify an investigatory stop based upon information provided by an unidentified informant because '"an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity."'" *State v. Williamson*, 368 S.W.3d 468, 475 (Tenn. 2012) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990))).

> Thus, in order to ensure reliability, before a motor vehicle can be validly detained based upon information received from an anonymous informant, there must be a showing of both 1) the basis of the informant's knowledge of the conveyed information and 2) the informant's credibility. *Day*, 263 S.W.3d at 903 (citing [*State v.*] *Pulley*, 863 S.W.2d [29,] 31 [(Tenn. 1993)]. The difficulty in utilizing this two-prong test to assess the reliability of a tip received from an informant whose identity is unknown is readily apparent. However, any deficiencies in demonstrating reliablility based upon this test can be cured by an investigating officer's independent corroboration of the anonymously provided information.

*State v. Hanning*, 296 S.W.3d 44, 49 (Tenn. 2009). Although an anonymous tip giving "[a]n accurate description of a subject's readily observable location and appearance is of course reliable" in assisting police officers in the positive identification of the person of interest, it "does not show that the tipster has knowledge of concealed criminal activity," and in order to rise to the level of reasonable suspicion, the tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272.

In *J.L.*, an anonymous person called 9-1-1 to report that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. When officers arrived at the bus stop a few minutes later, nothing illegal was transpiring and no firearm was readily observable, but J.L., one of the three black males present, was wearing a plaid shirt. *Id.* A police officer then frisked J.L. and located a handgun in his pocket. *Id.* The Court, in contrasting anonymous tips with those from a confidential informant, stated as follows:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veractiy. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.

*Id.* at 270 (internal citations and quotation marks omitted). In concluding that the stop and frisk of J.L. was unjustified in that it lacked "indicia of reliability," the Court found that the tip "provided no predictive information" and "left the police without means to test the informant's knowledge or credibility." *Id.* at 271, 274.

> That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. *All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.*

*Id.* at 271 (emphasis added).

Examining the instant case through the lens of *J.L.*, we similarly have an unknown and unidentified citizen who reported alleged illegal activity to a police officer while providing a description of the suspect but without providing any basis for his knowledge of the criminal activity. The information provided could have been obtained by anyone in the vicinity of the Walgreens and merely indicated the defendant's presence without indicating a sighting of illegal activity.

Although the anonymous tip in *J.L.* was provided via a 9-1-1 call and the tip in the underlying case was provided in person, "generally 'an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality.'" *State v. June Ann Wascher*, No. E2015-00961-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Knoxville, June 6, 2016) (quoting *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009)). Aside from descibing the tipster as a black male driving a green Mitsubishi Galant, Officer Whitehead did not know the tipster, he never asked for his name, and he did not record his license plate number. The tipster accurately described the defendant, whom he called by name, as driving a black Chrysler 300 with "rims" and mentioned that his vehicle was backed into a space at the nearby Walgreens near a Redbox machine. Significantly, however, the tipster provided no information about his basis of knowledge regarding the suspect's alleged sale of narcotics and apparently did not mention the specific type of narcotics allegedly being sold. Under the circumstances, the "bare report of an unknown, unaccountable informant" who failed to explain "how he knew about" the narcotics or "suppl[y] any basis for believing he had inside information about" the defendant was insufficient to justify the officers' subsequent stop and seizure of the defendant. *J.L.*, 529 U.S. at 271.

Although the State urges this court to follow a totality-of-the-circumstances analysis, as adopted by our high court in *State v. Tuttle*, 515 S.W.3d 282 (Tenn. 2017), the State's reliance on *Tuttle* is inapt. The supreme court's decision in that case to overrule *State v. Jacumin*, 778 S.W.2d 430 (Tenn. 1989), and adopt the *Illinois v. Gates*, 462 U.S. 213 (1983), totality-of-the-circumstances analysis "for determining whether an affidavit establishes probable cause" for issuance of a search warrant did nothing to alter the Supreme Court's ruling in *J.L.* regarding the necessity of a reliable assertion of illegality within an anonymous tip. Furthermore, with respect to the State's attempt to rely on the defendant's location at a pharmacy within a "high drug/high crime area" to bolster its position regarding the credibility of the tip, our supreme court has addressed a similar argument thusly:

- 18 -

While the Baxter Motel's location in a high-crime area and the time of the complaint to the police may be relevant factors to the consideration of the propriety of a stop and frisk, those cases in which the Supreme Court upheld stops and frisks occurring in high-crime areas have included significant other factors, such as the reliability of the informant or the police officer's own observations. To accept the State's argument that the location of this encounter, the time at which it occurred, and the generalized "public[] interest in abating criminal activity" somehow tipped the scales in favor of reasonable suspicion would, in effect, establish an exception for those persons in "high-crime" areas at certain hours of the day or night. Such generalized authority to conduct random searches is precisely the type of evil against which the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution were meant to protect.

*Williamson*, 368 S.W.3d at 481 (internal footnotes omitted).

Even if, however, the anonymous tip in this case was sufficient to provide the police officers with reasonable suspicion to seek out the defendant at the Walgreens and conduct a brief, investigatory stop, the officers' sudden convergence on the Walgreens parking lot from three different directions and the decision by Officer Turner and Officer White to park their cruisers perpendicularly to the defendant's vehicle with little more than a car width between the cruisers and the nose of the defendant's vehicle certainly constituted a seizure of the defendant. A seizure has occurred when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." *State v. Daniel*, 12 S.W.3d 420, 425 (Tenn. 2000). Factors to be considered when making this determination include "the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen." *Id.* at 426.

This test is 'necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free

to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.'" *Id.* (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *State v. Moore*, 776 S.W.2d 933, 937 (Tenn. 1989). However, under the analysis delineated above, courts have consistently held that the Fourth Amendment is *not* implicated and no seizure occurs when police approach an individual, in a public place, or in a parked car, ask questions, and request to search, so long as police do not convey a message that compliance with their requests is required. On the other hand, courts have typically held that an encounter becomes a "seizure" if an officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

*Daniel*, 12 S.W.3d at 426 (citing LaFave § 9.3(a), at 104) (internal footnotes omitted).

In the instant case, no reasonable person in the defendant's situation would have felt free to leave when two police cruisers suddenly appeared and parked a few feet in front of the defendant's vehicle. Although Officer Turner testified at trial that the defendant was free to leave at that time, the defendant's means of egress, if not completely blocked, was certainly hindered. This was evidenced on Officer Turner's cruiser video which showed the driver of a small sedan, parked two spaces away from the defendant's vehicle, who, less than one minute after officers arrived on the scene, struggled to back out of his parking space due to the presence of Officer White's cruiser behind his vehicle. The driver of the sedan, after initially reversing his vehicle, then pulling forward and reversing again, was eventually able to slowly maneuver past the rear of Officer White's cruiser. Unlike the sedan, the defendant's vehicle was facing outward, but leaving his parking space would have required edging past two police cruisers. In our view, the hindrance of the defendant's vehicle's movement coupled with the threatening presence of the police officers suddenly converging in front of the defendant's vehicle from different directions constituted a seizure of the defendant, and the evidence, including the video, preponderates against the suppression court's implicit finding that the defendant was not seized at this point.

- 20 -

Again, however, even if the sudden presence of the police cruisers in front of the defendant's vehicle did not constitute a seizure, the subsequent encounter with the defendant unquestionably did.

When officers initially approached the defendant's vehicle at 15:37:37, the defendant was seated in the driver's seat with the driver's side window down. After an initial brief exchange of pleasantries, the defendant told the officers that he was "giving somebody a ride" and asked "what's the problem," to which an officer asked for the location of the person to whom the defendant was giving a ride. The defendant explained that the person was "inside the store," and an officer asked for a description of the person's clothing so that officers could verify the defendant's account. The defendant explained that a "[y]oung lady" was inside the store waiting on a prescription, and the defendant again asked the officers, "What's the problem?" At that point, officers told him that they had received a complaint that he was selling narcotics in the parking lot. The defendant denied selling drugs and denied having anything illegal in his vehicle or on his person. Despite the defendant's denial and officers' failure to observe any illegal activity or any visible narcotics, officers asked the defendant to step out of his vehicle, and the defendant immediately complied.

Shortly after conducting a weapons pat-down of the defendant and finding nothing, an officer tells the defendant, at 15:39:08, "You're good, if you want to hang tight on the sidewalk there." At this point, officers had no reason to continue their detention of the defendant. He had denied selling narcotics, officers found nothing illegal on the defendant's person after a pat-down and had seen nothing illegal in the defendant's vehicle, and the defendant had fully cooperated with them. Indeed, an officer even told the defendant that he was "good," yet requested that he "hang tight." Although the defendant is not technically "physically restrained," as set forth in *Daniel*, a reasonable person would certainly not feel at liberty to leave when instructed by a police officer to wait. The defendant was unquestionably seized at this point in the encounter.

Still, the defendant continued to cooperate and make small talk with the officers. More than one minute later, an officer again instructs the defendant to "hang tight." The only instance in which the defendant seemed remotely frustrated with officers is when he was again asked the name of the person he was waiting on, and the defendant, sounding exasperated, responded, "You said somebody said, they called and said I was doing something. Here I am." At no point, however, did the defendant behave in a confrontational manner with the officers. When an officer again asked if there was anything illegal in the vehicle, the defendant responds in the negative, and an officer says that someone had apparently given them "false information," but officers still did not

- 21 -

release the defendant. They asked if they could "look[] through" his vehicle, and the defendant refused. However, a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991). Even after declining to allow officers to search his vehicle, the defendant continued to stand with officers and engage in polite conversation because, again, a reasonable person in the defendant's situation would not have felt free to leave.

Officer Whitehead's dog began his vehicle sniff at 15:43:27. The dog twice circled the defendant's vehicle, and each rotation took 10 seconds. The dog's alleged reaction, during the second vehicle rotation, on the rear back passenger door of the vehicle was not visible on the cruiser videos. At 15:45:48, more than two minutes after the dog completed his vehicle sniff, the defendant was informed that the dog had made a positive "alert" and that officers were going to search his vehicle. The search ultimately yielded prescription medication, albeit in different amounts and dosages than listed on the pill bottles, that the dog was not trained to discover.

Taking all of this into consideration, we determine that the evidence clearly preponderates against the suppression court's finding that the detention of the defendant prior to the vehicle sniff was "a very short period of time" and the trial court's finding that the defendant's "brief investigatory detention" on the sidewalk was supported by reasonable suspicion based on the anonymous tip. More than four minutes passed between the officers' initially informing the defendant that he was "good" but asking him to wait on the sidewalk and the officers' informing the defendant that the dog had reacted to his vehicle. Nothing in the record indicates that this time period was utilized by the officers to perform administrative tasks such as checking vehicle registration or the defendant's driver's licence. *See State v. Harris*, 280 S.W.3d 832, 842 (Tenn. Crim. App. 2008) ("[E]ither (1) the canine sweep of the defendant's vehicle must be properly accomodated *within* the duration and scope of the legal traffic stop, or, if not, (2) it must be independently justified by the facts."). Once it was clear to the officers at 15:39:08 that there was no proof of illegal activity, the purpose of the brief investigatory stop had ended, and the officers had no reasonable suspicion to continue detaining the defendant. The defendant was seized at this point in the encounter, as evinced by the officers' attempts to effectively retain the defendant's vehicle by asking him to step out of it and not indicating that he was free to reenter his vehicle and by continuing to tell the defendant to wait. *See Daniel*, 12 S.W.3d at 426.

Because the defendant was seized and his vehicle ultimately searched without reasonable suspicion, the evidence obtained from the resulting illegal search should have been suppressed, and because, under the circumstances in this case, the

suppression of the illegally-obtained evidence leaves nothing on which to prosecute the defendant in a retrial, the judgments of conviction against the defendant are vacated, and the case is dismissed.

Having concluded that the defendant's convictions must be vacated, we nevertheless will address the defendant's remaining issue in the interests of judicial economy and potential further appellate review.

## II. Defendant's Prior Convictions

The defendant also contends that the trial court abused its discretion by permitting the State to use the defendant's prior felony convictions of aggravated burglary and attempted second-degree murder for impeachment purposes.

Tennessee Rule of Evidence 609 provides, in pertinent part:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

. . . .

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial *but in any event shall rule prior to the testimony of the accused.* If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

Tenn. R. Evid. 609(a)-(b). We review the trial court's determination of this issue via an abuse of discretion standard. *State v. Thompson*, 36 S.W.3d 102, 110 (Tenn. Crim. App. 2000). If, however, the trial court "fails to comply with the procedural requirements of Rule 609, we must independently determine the admissibility of the prior impeaching conviction based on the evidence presented." *State v. Lankford*, 298 S.W.3d 176, 182 (Tenn. 2008).

Prior to trial in the instant case, the State filed a notice of intent to use the defendant's 1994 convictions of attempted second degree murder and aggravated burglary for impeachment purposes if the defendant were to testify. The notice was apparently never addressed prior to trial.

During the defendant's *Momon* colloquy, he announced his intention to testify, and no one addressed the defendant's prior convictions at that time. Following the defendant's direct examination, the prosecutor requested a bench conference and informed the trial court of his intention to address the defendant's prior convictions during cross-examination. The trial court stated that "[t]his is an issue that certainly should have [been] addressed before [the defendant] decided to take the stand," but the court nevertheless determined that the probative value of the defendant's prior convictions of attempted second degree murder and aggravated burglary was not outweighed by the danger of unfair prejudice.

We hold that the admission of these prior convictions was in error. As this court has held, "Rule 609 requires a trial court to rule on the admissibility of an

- 24 -

impeaching conviction before the [d]efendant begins his testimony." *State v. Garry Baker,* No. M2016-01164-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App., Knoxville, Apr. 28, 2017) (citing Tenn. R. Evid. 609(a)(3)).  Because the trial court failed to follow this procedure, the prior convictions were inadmissible.  Furthermore, we cannot deem the admission of these convictions as harmless because the proof of the defendant's guilt was not overwhelming, and this error alone constituted reversible error.

*Conclusion*

Based upon the foregoing analysis, the judgments of the trial court are vacated, and the case is dismissed.

_____
JAMES CURWOOD WITT, JR., JUDGE